UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff | ) | CRIMINAL NO. 5:11-131 |
| | ) | |
| v. | ) | |
| | ) | **OPINION AND ORDER** |
| LAKISHA D. SLATON, | ) | |
| KELVIN J. LEWIS, and | ) | |
| LATRICE BRITTON | ) | |
| Defendants | ) | |

* * * * * * * *

This matter is before the Court on various motions filed by the Defendants including several motions to suppress evidence.

In an Opinion and Order dated June 22, 2012 (DE 147), this Court previously ruled on the first motions to suppress evidence filed by Defendants Lewis and Slaton (DE 86, 92). With regard to those motions, the Court conducted two hearings and the Opinion and Order contains detailed findings of fact. In their briefing on the current motions, neither the Defendants nor the government object to any of those findings of fact. Accordingly, the findings are set forth below and will be relied upon in this opinion.

## I.    Undisputed Facts from the Court's June 22, 2012 Opinion.

A cooperating informant informed Detective [Jared Scott] Curtsinger that a man named Jerry Clemons was dealing large quantities of oxycodone pills at his residence at 157 Suburban Court in Lexington, Kentucky. (DE 116, Tr. at 10.) Detective Curtsinger then arranged for that individual to make controlled buys from Clemons on two occasions. (DE 116, Tr. at 10.) On August 23, 2011, Lexington police officers searched Clemons' residence pursuant to a search warrant and discovered some oxycodone pills and a cell phone containing messages that indicated he was involved in trafficking controlled substances. (DE 116, Tr. at 10.)

Clemons agreed to cooperate with the officers in their investigation and informed them that two of his main suppliers were a female named "Keli" and her boyfriend, "Gomez." (DE 116, Tr. at 11.) The officers

later learned that "Keli" was Keli Nicholson and that "Gomez" was Gregory Weisbrodt. (DE 116, Tr. at 11.) In cooperation with the officers, Clemons arranged via text messages to purchase oxycodone pills from Weisbrodt and Nicholson. (DE 116, Tr. at 12.) When Nicholson and Weisbrodt arrived at Clemons' home, the officers arrested them and found several hundred oxycodone pills in the vehicle that Nicholson and Weisbrodt were driving. (DE 116, Tr. at 12.)

Weisbrodt and Nicholson agreed to cooperate with the police investigation and told the officers they had obtained the pills from a person they knew as "Keshon." They described Keshon as a black male in his 20s or 30s who was from the Florida area. They further advised that they communicated with Keshon by text messages or cell phone calls. (DE 116, Tr. at 13.) Detective Curtsinger reviewed the text messages on Nicholson's and Weisbrodt's cell phones and found text messages on at least one of them to Keshon. (DE 116, Tr. at 13.) The police report prepared by Detective Curtsinger states that one of the text messages from Nicholson to Keshon said she needed about an hour to "drop packages." Another stated that she owed Keshon $3,000 and that she was going to the doctor to get 150 pills and that Greg was going to get 180 pills. Another stated that she needed 150 pills and would drop off 90. According to the report, Keshon texted he would bring them. (DE 127, Ex. 1.)

Detective Curtsinger testified that the cooperating witnesses told officers that Keshon and a female were driving a dark-colored passenger car, possibly a Nissan, when they delivered the pills to Nicholson and Weisbrodt. (DE 116, Tr. at 16.) Detective Curtsinger further testified that Nicholson stated that she had been involved with drug transactions with Keshon for a month or so but that the black female had only been driving him for the past several days. (DE 116, Tr. at 59, 60, 62). Curtsinger also testified that Nicholson told the officers that another large black male was around during at least one other drug transaction with Keshon during the last few weeks. (DE 116, Tr. at 17, 43.)

Nicholson testified that she had known Keshon a few weeks prior to the day she was arrested. (DE 116, Tr. at 114.). She testified that she obtained oxycodone pills from him and guessed that she did so six times over a couple of weekends. (DE 116, Tr. at 114, 115.) She testified that she told the officers she had seen other people with Keshon a couple of times and that one of those people was a female in a car in the parking lot at the Best Western but that the female was not driving the car. (DE 116, Tr. at 117-18, 125.) She testified that she never saw that female's face and that she told the officers that. (DE 116, Tr. at 119-20.)

At the suppression hearing, Nicholson was not able to identify Slaton as the female with Keshon on the day that Nicholson was arrested

or as the female that was with Keshon during prior transactions. (DE 116, Tr. at 119-20.) She testified that she did not tell Detective Curtsinger that she had seen Slaton at a prior drug transaction with Kelvin Lewis. (DE 116, Tr. at 125.) She testified that she also saw Keshon with a black male driving him and that she told the officers that. (DE 116, Tr. at 117, 122.) Nicholson testified that she did not remember telling the officers that Keshon was with a female on the day of Nicholson's arrest. (DE 116, Tr. at 119.) Nor could she recall telling the officers that Keshon was in a Nissan. (DE 116, Tr. at 119.)

Detective Curtsinger testified that Nicholson and Weisbrodt also advised that they believed that Keshon was staying at the Ramada Inn and that, just about an hour prior to their arrest, he had supplied them with a large majority of the pills the police had found in their vehicle. They informed the officers that they were to return approximately $2,600 to him in cash to pay him back for the pills. (DE 116, Tr. at 14.) Detective Curtsinger testified that, in his experience, when a dealer gives individuals 200 pills to be sold – as opposed to 1,000 pills or larger quantities -- then he would expect them to return in a "very short" timeframe with the money. (DE 116, Tr. at 15.)

Detective Curtsinger testified that the officers permitted Nicholson and Weisbrodt to get back in their car and the officers followed them to a parking lot near the Best Western which was where Nicholson and Weisbrodt were staying. (DE 116, Tr. at 16, 18.) The officers kept Nicholson and Weisbrodt's cell phones. Curtsinger testified that, once the officers and Nicholson and Weisbrodt arrived at the parking lot, they sent text messages from Weisbrodt or Nicholson's phone to the person listed in the phone as "Keshon." (DE 116, Tr. at 16.) Detective Curtsinger testified that the text messages advised that Nicholson and Weisbrodt had the money and were ready for another large supply of oxycodone pills. (DE 116, Tr. at 16.) The police report stated that the officers instructed Nicholson to text Keshon and "let him know everything was good and that they had to make one more stop and should be there in about thirty minutes and are going to need two hundred more pills if he has them." The report states that Keshon texted back, "yup." (DE 127, Ex. 1.)

Detective Curtsinger testified that these text messages were sent outside of the timeframe that Keshon would have expected Nicholson and Weisbrodt to arrive with the money for the prior supply of pills. (DE 116, Tr. at 16.) When asked on cross-examination what the specific timeframe was, Detective Curtsinger stated that he was not certain but that Nicholson advised the officers that Keshon would have expected to have heard from her and Weisbrodt at this point and that it would look suspicious if they did not contact him. (DE 116, Tr. at 36-37.)

3

Detective Curtsinger testified that the officers were sending the messages to Keshon from a parking lot near the Best Western. (DE 116, Tr. at 17-18.) He testified that Keshon texted back "I'll be there in 15." (DE 116, Tr. at 20.) He testified that the officers then went to the hotel room at the Best Western and set up inside of it. (DE 116, Tr. at 18, 20.) Curtsinger testified that he, Weisbrodt, Nicholson and two or three other detectives were inside the hotel room. (DE 116, Tr. at 20.)

He testified that some police units were outside on the perimeter looking out for a car matching the description provided by Nicholson and Weisbrodt. (DE 116, Tr. at 18.) Detective Keith Ford was among those officers that were on the perimeter. (DE 116, Tr. at 88.) He testified that he was looking for a dark Nissan. (DE 116, Tr. at 88.)

Curtsinger testified that Keshon did not arrive within 15 minutes so the officers sent another text from Nicholson's phone asking where he was. He testified that Keshon texted back indicating he was five minutes away. (DE 116, Tr. at 20.) Curtsinger testified that, within the next five to ten minutes, a gray passenger car arrived and parked beside Weisbrodt and Nicholson's car in front of the Best Western hotel room. (DE 116, Tr. at 20.) He testified that the vehicle matched the description provided by Weisbrodt and Nicholson. (DE 116, Tr. at 21.)

Curtsinger testified that Keshon got out of the passenger side of the car and walked to the hotel room door and knocked on it. (DE 116, Tr. at 21.) The officers inside the room confirmed with Nicholson that the car Keshon arrived in was the same car she had seen him in earlier. (DE 116, Tr. at 21-22.) The police report states that the officers also confirmed with Nicholson that the man at the door was "Keshon." (DE 127, Ex. 1.) Curtsinger testified that when Keshon arrived at the door, the officers placed him under arrest. (DE 116, Tr. at 22.) Afterward, Curtsinger confirmed with Nicholson and Weisbrodt that the individual arrested was the man they knew as Keshon. (DE 116, Tr. at 22.) Detective Curtsinger testified that he later learned that Keshon was the defendant Kelvin Lewis. (DE 116, Tr. at 22-23.)

The officers searched Lewis and found an empty prescription bottle for 140 oxycodone pills in his pocket. (DE 116, Tr. at 23.) The police report states that the prescription was dated August 17, 2011. (DE 127, Ex. 1.) The officers also found on Lewis two to three cell phones that were inexpensive and the same make and model. (DE 116, Tr. at 23.) Curtsinger testified that he considered these to be "drop" phones which he explained were phones that are commonly used for doing drug deals because they can be dropped in the trash if an individual fears he may be arrested and they cannot be traced back to the individual. (DE 116, Tr. at 23, 24.) Curtsinger testified that he also found a nicer, more expensive

phone on Lewis similar to an iPhone. (DE 116, Tr. at 23.) Curtsinger testified that he looked at the drop phones and that he believed one showed receipt of a text message from Keli Nicholson. (DE 116, Tr. at 24.) Curtsinger also testified that Lewis had approximately $1500 in cash on him. (DE 116, Tr. at 35.)

Detective Ford testified that when he was advised by another officer that a dark Nissan was driving through the parking lot at the Best Western, he drove toward the area. (DE 116, Tr. at 89-90.) He testified that when he arrived at the Best Western, an officer who he identified as Officer Washington, was at the side of the Nissan "in an encounter with a female who was driving." (DE 116, Tr. at 90.) Curtsinger testified that, after Lewis was arrested, he exited the hotel room and that it appeared that the officers by the car "might have been struggling with [the female driver] a little bit." (DE 116, Tr. at 25.) He testified that it appeared as if the female was "attempting to destroy a cell phone." (DE 116, Tr. at 25.)

Detective Ford testified that he looked inside the passenger side of the car and could see a cell phone "all in pieces disassembled on the floorboard of the passenger side." (DE 116, Tr. at 90-91.) He testified he could also see a hotel key card in the center console of the car. (DE 116, Tr. at 91.) He testified that, when he arrived, Officer Washington had already removed the female from the car and put her in handcuffs. (DE 116, Tr. at 91.) Curtsinger testified that the female who was arrested was Defendant Lakisha Slaton (DE 116, Tr. at 26.)

Detective Ford testified that he took part in the search of the car and removed the hotel key and put the disassembled cell phone in a plastic bag and gave it to Detective Curtsinger. (DE 116, Tr. at 91-92.) The police report states that the officers also found a PNC bank receipt showing a deposit a few hours earlier of $4,860 in cash. Curtsinger testified that he also took part in the search of the car. (DE 116, Tr. at 26.) He testified that the cell phone was located in the floorboard of the car and that the battery had been removed. (DE 116, Tr. at 25.)

Curtsinger testified that, in the search incident to arrest of Slaton, he found a cell phone on her. (DE 116, Tr. at 64). Curtsinger testified that, after the arrest, the officers brought Slaton and Lewis inside the Best Western hotel room. (DE 116, Tr. at 26-27.) He testified that Detective Ford obtained Slaton and Lewis's personal IDs and then took the hotel room key and the IDs to the Ramada Inn. (DE 116, Tr. at 27.) Curtsinger testified that Weisbrodt and Nicholson identified Slaton as the female they had seen in the car with Lewis earlier. (DE 116, Tr. at 28.) He testified that a police cruiser transported Weisbrodt and Nicholson to the Ramada. (DE 116, Tr. at 29.)

Detective Ford testified that when he arrived at the Ramada, the clerk told him that the key found in the car was a Ramada Inn key. (DE 116, Tr. at 93.) He said he showed the clerk the Florida IDs of the Defendants and the clerk said he recognized them and that they were in room 120. (DE 116, Tr. at 93.) Detective Ford said he knocked on the door of room 120 and there was no answer. (DE 116, Tr. at 93.) He opened the door and announced, "Police." (DE 116, Tr. at 94.) He testified that his purpose in entering the room was "securing the scene for the impending search warrant." (DE 116, Tr. at 94.) He testified that this meant he was "simply making sure no one was in the room, since the information was we had additional associates" and he needed to maintain and secure any evidence in the room. (DE 116, Tr. at 94, 99.)

Detective Ford testified that, after entering the hotel room, he walked into the bathroom and, when he found no one, looked between the beds to make sure no one was hiding on the floor. He then went to the very back wall of the room. (DE 116, Tr. at 94.) He testified that he saw suitcases in the room on the floor and that, as he was leaving the room, he noticed some plastic sandwich bags on the table in the room. (DE 116, Tr. at 95, 102.) The police report also states that Detective Ford saw a notepad on the same table that contained written numbers that were consistent with money and pill counts. Detective Ford testified that he called Detective Curtsinger to tell him no one was in the room and that the hotel key was for a room registered to Lewis and Slaton. (DE 116, Tr. at 95.) He testified that he stayed in the room for at least an hour while Detective Curtsinger obtained a search warrant. (DE 116, Tr. at 95, 96.) Detective Ford testified that he did not perform a search of the room. He only looked for people. (DE 116, Tr. at 95-96.)

Detective Ford testified that he stayed in the room, even after determining no one was in there, because the officers believed "there were associates who were outstanding, and there was no other way to watch the room. There's no vantage point for surveillance other than inside the room." (DE 116, Tr. at 108.) Detective Ford testified that the officers believed there were "associates that were outstanding involved in selling pills throughout Lexington, and that was their home base of operations based on what were were told." (DE 116, Tr. at 108-09.) He testified that he had no information that the associates would be coming to the hotel room but also had no information that the associates would not be. (DE 116, Tr. at 109.)

Shawn Bumpase, the General Manager of the Ramada Inn at the time of the search, testified that he went to room 120 after the officers entered it and knocked on the door which was shut and locked. (DE 116, Tr. at 129.) He testified that one officer opened the door after a minute or two and that were two officers in the room. (DE 116, Tr. at 130.) He

testified he saw one suitcase on the bed. (DE 116, Tr. at 130.) He testified that one officer was standing in the middle of the room and was wearing blue gloves. (DE 116, Tr. at 130, 136.).

The Defendant Lewis testified at a second hearing on the Motion to Suppress. He testified that, after he was arrested, the officers took him to his room at the Ramada Inn which he identified as room 120. He further testified that Slaton was staying with him in the room but that the room was registered under his name. He testified that he and Slaton slept in one bed but that, when they arrived in the room after their arrest, the bed they had not slept in or even sat upon was messed up as if someone had slept in it. He testified that, when he left the room, his suitcase was on the floor and was closed and zipped. He testified that, when he returned, there were clothes hanging out of the side of the suitcase. He also testified that, when he left the room, the lid on a box of donuts on the microwave was closed but that the lid was up when the officers brought him back in the room. He testified that this was before an officer arrived with a search warrant.

Detective Curtsinger obtained a search warrant from a state district judge. (DE 116, Tr. at 33). Detective Ford testified that four or five other officers showed up to conduct the search. (DE 116, Tr. at 111.) Detective Curtsinger testified that, inside the hotel room, the officers found bags of oxycodone pills, a large amount of money, and torn slips of paper that had numbers in the hundreds written on them that indicated the pill counts in the bags. (DE 116, Tr. at 34.) He testified that there were two suitcases in the room – one with men's clothes and one with women's and that the officers found the pills in the men's suitcase. (DE 116, Tr. at 74.) He testified the officers seized no evidence from the women's suitcase. (DE 116, Tr. at 75.) Detective Ford testified that the suitcases were on the floor. (DE 116, Tr. at 102.)

For the reasons detailed in the Court's June 22, 2012 Opinion, the Court determined that the officers had probable cause to arrest Lewis. Thus, the evidence seized from his person, including the text messages on various cellphones he was carrying, was lawfully seized as a search incident to arrest. The Court also determined that the officers had not demonstrated that they had probable cause to arrest Slaton. Accordingly, the Court determined that any items seized from her person must be suppressed. The Court further determined that the search of the car in which Lewis

arrived at the Best Western was legal pursuant to the automobile exception to the warrant requirement. Finally, the Court determined that the state district judge had probable cause to issue the search warrant for Ramada Inn Room 201 and, thus, all evidence seized from the room is admissible.

## II.    Current Motions.

### A.    Defendant Lewis's Second Motion to Suppress (DE 177).

With his Second Motion to Suppress, Lewis again argues that the officers did not have probable cause to believe that the car contained contraband or evidence of a crime. The Court has reviewed its June 22, 2012 opinion and continues to find the officers had probable cause to search the automobile.

In his current motion, Lewis argues specifically that the officers conducting the search would not have known about the text messages that Curtsinger discovered on Lewis's cell phone after his arrest. This may be true but the officers still had more than probable cause to believe the car contained contraband or evidence of drug transactions. To summarize, the officers knew before they searched the car that Lewis, under the name of "Keshon," had texted Nicholson and indicated he would be bringing 200 oxycodone pills to the hotel; that, when Lewis arrived at the hotel, he had no pills on his person but did have an empty prescription bottle for 140 pills; and that Lewis arrived at the hotel in the car that was searched and emerged from it just prior to his arrest. The officers had probable cause to believe the car contained contraband.

Lewis argues that, before searching the car, the officers relied solely on Nicholson's uncorroborated information that Lewis was her supplier. This is simply not true. The officers conducted an investigation to corroborate Nicholson's information.

During that investigation, they learned that Nicholson had text messages on her phone from Lewis – acting as "Keshon" – indicating that he was her supplier; that Lewis arrived for prior drug transactions with Nicholson in a dark-colored car; that, after the officers texted Lewis from Nicholson's phone indicating that Nicholson wanted another large quantity of pills, Lewis indicated he would bring them; that a dark-colored car arrived at the Best Western outside Nicholson's room within the time frame indicated by the texts; that a man matching the description Nicholson had provided the officers got out of the car and knocked on Nicholson's door; and that the man did not have pills on him but did have an empty prescription bottle for 140 pills and $1500 in cash.

The officers' investigation more than corroborated Nicholson's assertion that Lewis was her supplier.

Lewis also argues that the officers were required to "corroborate information provided by Nicholson *prior to* encouraging her to communicate with Defendant in an effort to purchase prescription pills." (DE 177 at 7) (emphasis added.) This is incorrect.

The use of undercover agents and informers to elicit incriminating statements from potential criminal defendants does not constitute a search under the Fourth Amendment. *United States v. White*, 401 U.S. 745, 749-751 (1971); *Hoffa v. United States*, 385 U.S. 293, 302-303 (1967). As the Supreme Court has explained, the Fourth Amendment does not protect "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Hoffa*, 385 U.S. at 302. A defendant has no "constitutionally protected expectation that a person with whom he is conversing will not then or later reveal the conversation to the police." *White*, 401 U.S. at 749. No warrant is required in that situation. *Id*. Nor is a warrant required when the

government sends a secret agent to a person's home to buy drugs or when that agent records conversations with the defendant. *Id.*

Thus, the text from Nicholson's phone to Lewis, even if orchestrated by the officers, did not constitute a search of Lewis. At that time, the officers did not need to have probable cause to believe that Lewis was involved in a crime. Further, Lewis's responses to Nicholson's texts which Nicholson permitted the officers to observe served as the corroboration of Nicholson's statements that Lewis was her supplier.

For all these reasons, and those stated in this Court's June 22, 2012 Opinion, Lewis's Second Motion to Suppress will be DENIED.

**B.      Defendant Slaton's Second Motion to Suppress (DE 184).**

As discussed, in its June 22, 2012 Opinion, the Court ruled that the police did not have probable cause to arrest Defendant Lakisha Slaton. In her second motion to suppress (DE 184), she argues that the evidence obtained from the car should be suppressed as to her. This is incorrect. The Court has found that the search of the car was permissible under the automobile exception to the warrant requirement, not as a search incident to Slaton's arrest. Accordingly, no defendant's Fourth Amendment rights were violated by the search of the car and there is no reason to suppress any evidence found in the car.

For these reasons and those stated in the Court's June 22, 2012 Opinion, Lakisha Slaton's Second Motion to Suppress (DE 184) is DENIED.

**C.      Defendant Lewis's Motion to Compel (DE 181).**

Defendant Lewis has also filed a Motion to Compel (DE 181) in which he asks the Court to order the government to provide him with copies of the text messages from

Nicholson's phone that the officers relied on prior to and at the time of his arrest.  In response, the government states that the texts will be available for inspection at a mutually agreed upon time and place if the messages can be retrieved from Nicholson's phone.  Accordingly, Lewis's motion will be DENIED as moot with leave for the Defendant to reassert it should the government not make the text messages available for his inspection

   **D.    Defendant Lewis's Motion to Suppress Evidence Pursuant to Search Warrant Issued Based on Defective Affidavit (DE 182).**

   Defendant Lewis has filed a third Motion to Suppress Evidence (DE 182).  In this motion, Lewis argues that the affidavit was defective that was used to obtain the search warrant authorizing the search of room 120 at the Ramada Inn. Co-Defendants Slaton and Britton have joined in this motion.

   "When reviewing a magistrate's determination that probable cause existed for the issuance of a search warrant, [a court] must determine, under a totality of the circumstances, whether 'the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing.'" *United States v. Miggins*, 302 F.3d 384, 393 (6th Cir.2002) (quoting *United States v. King*, 227 F.3d 732, 739 (6th Cir.2000)).

   In its June 22, 2012 Opinion, the Court ruled that, even excising from the affidavit any facts regarding evidence seized from Slaton's person and viewed by Detective Ford upon his warrantless entry into the hotel room, the state court district judge had probable cause to believe that room 120 contained evidence of a crime.  As the Court recited in that opinion, the affidavit stated that:

- Clemons had admitted selling oxycodone and had agreed to a controlled buy with Nicholson and Weisbrodt;

- Nicholson and Weisbrodt arrived at Clemons' residence with over 100 oxycodone pills and that they admitted to selling them;

- Nicholson and Weisbrodt informed the officers that their supplier was "Keshawn," that he was staying at the Ramada Inn, that they were supposed to bring him back $2,600 in cash when they sold the pills and that they were supposed to place another order from him after they paid him the money;

- Nicholson and Weisbrodt informed the officers that Keshawn was a black male in his 30s from Florida and that he was driving a black Nissan passenger car accompanied by his girlfriend;

- when the officers went to the Best Western with Nicholson and Weisbrodt, Nicholson texted Keshawn advising him that she had the money and wanted 200 more pills and that he replied back that he would be there in 15 minutes and later sent a text saying it would be 5 more minutes;

- within the time frame set forth in Nicholson's texts, the officers observed a black Nissan passenger car arrive in the parking lot and park next to Nicholson's car;

- a person that Nicholson identified as Keshawn and that matched her description of Keshawn emerged from the car and knocked on Nicholson's hotel room door;

- after arresting Keshawn, the officers found on him an empty oxycodone prescription bottle for 140 pills issued five days before the search; $1,500 in cash; and three cell phones, one of which was the cell phone Nicholson had texted;

- the officers retrieved from the car a hotel room key and a receipt from a PNC bank account showing a deposit on that day of $4,600 in cash; and

- that Detective Ford took Lewis's identification and the room key to the Ramada Inn and that the manager advised that Lewis was staying in Room 120 and that the room key was for room 120.

The Court continues to find that, based on these facts, the state court district judge who issued the warrant correctly determined that there was a fair probability that contraband or evidence of a crime would be found in Ramada Inn room 120.

In their motion now before the Court, the Defendants argue that there were five problems with Detective Curtsinger's affidavit.

The Defendents' first argument is that Detective Curtsinger falsely implied that the text messages that day between Nicholson and Lewis showed that Lewis had a clear intent to engage in a drug transaction. In the affidavit, Curtsinger states that Nicholson texted Lewis, under his assumed , advising that she had the money from selling the 100-plus pills he had supplied her that day and that she wanted 200 more pills. Curtsinger further states that Lewis replied back that he was good for the 200 pills and would be over in the next 15 minutes. There is no evidence that these statements are untrue.

The Defendants appear to argue that they are entitled to an evidentiary hearing on this issue under *Franks v. Delaware*, 438 U.S. 154 (1978). "A defendant is entitled to a hearing to challenge the validity of a search warrant if he 'makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [ ] the allegedly false statement is necessary to the finding of probable cause.'" *United States v. Graham*, 275 F.3d 490, 505 (6th Cir. 2001) (citing *Franks*, 438 U.S. at 155-56). The Defendants have thus far made no showing that Detective Curtsinger made a material false statement in the affidavit. If any transcript of the text messages should indicate any such false statement as the Defendants assert, then they may reassert this argument.

On this issue, the Defendants also argue that Detective Curtsinger was required in the affidavit to quote verbatim the text messages instead of describing the content of the messages. The Defendants cite no law supporting this argument. Detective Curtsinger was permitted to accurately describe the text messages in the affidavit. There is no requirement that he quote the messages word for word.

The Defendants' second argument is that, in the affidavit, Curtsinger "based many of his conclusions on his training and experience" but that he failed to explain his training and experience. In the affidavit, however, Curtsinger does not present any conclusions that are based on his training and experience. Instead, the affidavit sets forth the facts regarding the investigation that ultimately led the officers to Lewis and Ramada Inn room 102.

At the end of the attachment, Curtsinger does set forth three statements that he asserts are "common knowledge," i.e., that drug dealers often communicate by cell phone text messages and phone calls to arrange drug transactions; that drug dealers store illegal drugs in safes and compartments within their residences to avoid theft and detection; and that they keep records of debt and other incriminating documents in their residence.

None of these statements was, however, necessary for the state judge's probable cause determination. Again, other than these three statements, the rest of the affidavit consists of investigative facts that more than support the judge's probable cause determination. Further, Detective Curtsinger stated that he was an officer with the Lexington-Fayette Urban County Division of Police and that he had served in that capacity for nine years. This is sufficient detail of his training and experience to support the three statements of "common knowledge" in the affidavit. Finally, as will be explained further, the Sixth Circuit has recognized that evidence of drug dealing is likely to be found where the drug dealer resides.

Which leads to the Defendants' third argument: that the affidavit is deficient because Curtsinger did not set forth facts that would support a determination that there was probable cause to believe that the hotel room contained evidence of a crime. "[I]n the

case of drug dealers, evidence is likely to be found where the dealers reside." *United States v. Goward*, 188 F. App'x 355, 358-59 (6th Cir. 2006) (quoting *United States v. Frazier*, 423 F.3d 526, 537 (6th Cir. 2005). This includes a hotel room serving as the drug dealer's temporary residence. *United States v. Taylor*, 471 F. App'x 499, 512-14 (6th Cir. 2012). The affidavit set forth sufficient facts to permit the state court district judge to conclude that Lewis had engaged in drug dealing. Thus, the district judge correctly concluded that evidence of that crime would likely be found in the hotel room in which Lewis was residing.

The Defendants' fourth argument is that the affidavit was deficient because it does not include any facts indicating that Nicholson was credible. As the Court has explained several times, the officers corroborated Nicholson's information through further investigation, the facts of which were detailed in the affidavit. The affidavit sets forth the texts between Nicholson and Lewis corroborating that Lewis had supplied Nicholson with drugs in the past and indicating that Lewis had agreed to bring her 200 more pills. The affidavit also explained that a person matching Nicholson's description of Lewis arrived at the Best Western within the timeframe set forth in the texts and knocked on Nicholson's door. Finally, the affidavit explained that the officers found on Lewis an empty oxycodone prescription bottle for 140 pills issued five days before the search, $1,500 in cash and three cell phones – one of which was the cell phone Nicholson had texted – and that they found in the car a receipt from a PNC bank account showing a deposit on that day of $4,600 in cash. Thus, the affidavit contains facts corroborating Nicholson's assertion that Lewis had supplied her with a large quantity of pills.

The Defendants' fifth argument is that the affidavit is deficient because Curtsinger only signed the second page and did not sign the last page. Detective Curtsinger signed the second page on the signature line. The second page also contains a checked box indicating that there is an attachment. Having signed the affidavit in the location indicated and having indicated on the signature page that a third page was attached, Detective Curtsinger was not required to sign the third-page attachment.

Furthermore, even if the warrant were to be determined to be invalid, the good-faith exception to the warrant requirement would apply. In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court established the good faith exception, stating that evidence should be suppressed based on a lack of probable cause only if the supporting affidavit was "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Leon*, 468 U.S. at 923.

There are four exceptions to this rule: (1) where the supporting affidavit contains information the affiant knew or should have known is false; (2) where the issuing magistrate lacked neutrality and detachment; (3) where the affidavit is devoid of information that would support a probable cause determination making any belief that probable cause exists completely unreasonable; or (4) where the warrant is facially deficient. *United States v. Helton*, 314 F.3d 812, 824 (6th Cir.2003). None of the exceptions are present here.

As discussed, the Defendants have not shown that there was any known false information in the affidavit. There is no allegation that the state judge was not neutral and detached. The state judge's probable cause determination was at least reasonable and the warrant was not facially deficient.

The Defendants argue that the affidavit was "bare bones." An affidavit is "bare bones" if it "states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir.1996). As discussed, the affidavit in this case contains substantial facts detailing the officers' investigation and demonstrating that Lewis was engaged in drug transactions. Thus, the officers were objectively reasonable in relying on the warrant to search Lewis's hotel room for evidence of that crime. The officers had a "reasonable basis to believe that the information that was submitted supported the issuance of a search warrant." *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir.2004)(emphasis omitted).

In this motion to suppress, the Defendants also appear to argue that the search was illegal because an unreasonable amount of time elapsed between the time that the officers seized the room without a warrant and the time that the room was searched pursuant to the warrant. This argument does not go to the sufficiency of the affidavit but instead to the legality of the search.

In support of this argument, the Defendants cite *United States v. Holzman*, 871 F.2d 1496 (9th Cir. 1989), *overruled on other grounds by Horton v. California*, 496 U.S. 128 (1990). In that case, the court determined that a 13-hour seizure of a hotel room before the officers conducted a warranted search was not unreasonable. *Id*. at 1507. This was partly because the seizure began at midnight and the warranted search began at 1:00 p.m. Thus, the court determined it was reasonable to assume the judicial officers were not readily available for consideration of warrant requests and that the officer applying

for the warrant spent most of the day preparing the affidavit and presenting it to the judicial officers. *Id*.

The Defendants also cite *United States v. Song Ja Cha*, 597 F.3d 995 (9th Cir. 2010) in which the court determined that a 26.5-hour-delay between the time when the officers seized a residence and the time when the warranted search was conducted was unreasonable. *Id*. at 997, 999. In that case, the court noted that the seizure occurred in the morning and the officers had all day Sunday to obtain the warrant before "the late-night-hour of 10 p.m." *Id*. at 1001. Further, there was evidence that a judicial officer was available to the officers even at night. *Id*. Further, the owner of the premises was not under arrest or in police custody. Thus, his "possessory interests were quite strong instead of 'virtually nonexistent'" as they would have been had he been in custody. *Id*.

In this case, at the evidentiary hearing, Detective Ford testified that he was in the hotel room approximately an hour before Detective Curtsinger arrived with the warrant. (DE 116, Tr. at 103, 110-11.) A one-hour lapse between the seizure of the hotel room and the warranted search is not unreasonable.

While the cases cited by the Defendants discuss the lapse of time between seizure and search of the premises, in their motion, the Defendants appear to be arguing that there was an unreasonable delay between Lewis's arrest and the search of room 120. (DE 182, Mem. at 10.). The Defendants cite no case law on this issue.

Further, the Defendants argues that 20 hours lapsed between Lewis's arrest and the search of the hotel room but this cannot be true. Detective Curtsinger's affidavit states that Nicholson arrived at Clemons' home at 3:00 p.m. on August 23, 2011. The

district judge signed the search warrant at 8:30 p.m. on the same day. (DE 103-2.) This is a 5 ½ hour lapse.

Detective Ford testified that he was in the hotel room only about a hour when Detective Curtsinger arrived with the warrant. The warrant appears to state that it was executed at 9:00 p.m. (DE 103-2.) But, assuming that Detective Curtsinger arrived at 9:30 p.m. – a full hour after the judge signed the warrant – there was a 6 ½ hour lapse between Nicholson arriving at the Clemons' residence and the search of the hotel room. Even if the officers arrested Lewis near the beginning of this time frame, there was not an unreasonable delay between his arrest and the search of the hotel room.

For all these reasons, and those stated in the Court's June 22, 2012 Opinion and Order, the Court hereby ORDERS that the Defendant's Motion to Suppress Evidence Pursuant to Search Warrant Issued Based on Defective Affidavit (DE 182) is DENIED.

### III.    Conclusion.

For all these reasons, and those stated in the Court's June 22, 2012 Opinion and Order, the Court hereby ORDERS as follows:

1)    Defendant Lewis's Second Motion to Suppress (DE 177) is DENIED;

2)    Defendant Slaton's Second Motion to Suppress (DE 184) is DENIED;

3)    Defendant Kelvin Lewis's Motion to Compel Production of Phone Text Messages (DE 181) is DENIED; and

4)    the Defendants' Motion to Suppress Evidence Pursuant to Search Warrant Issued Based on Defective Affidavit (DE 182) is DENIED.

Dated this 12th day of February, 2013.



Signed By:

*Karen K. Caldwell*

**United States District Judge**